IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ARNOLD DEWITT HOLLAND

CRIMINAL ACTION FILE NO.

1:19-CR-399-MLB-JKL

## FINAL REPORT AND RECOMMENDATION

Defendant Arnold Dewitt Holland is charged in this case with four counts each of production of child pornography, enticement of a minor, and committing a felony offense involving a minor as a convicted sex offender, as well as one count each of possession of and distribution of child pornography. [Doc. 1.] Holland is alleged to have committed the underlying acts while on supervised release following an earlier conviction for receipt of child pornography. [*Id*.] The case is before the Court on Holland's Amended Motion to Suppress Tangible and Derivative Evidence [Doc. 16 (the "Motion"); *see also* Doc. 13 (original motion)], in which he moves to suppress evidence extracted from four cell phones seized following a search of his residence by Probation Officers on January 14, 2019. Holland contends that the officers lacked reasonable suspicion to search his

residence and, thus, the cell phones and their contents should be suppressed as fruit of the poisonous tree.  [*Id.*]

On December 19, 2019, I held an evidentiary hearing at which Georgia Bureau of Investigation ("GBI") Special Agent ("SA") Elizabeth Bigham and Senior U.S. Probation Officer Shannon Brewer testified.  [*See* Doc. 28 (hearing transcript, hereinafter "Hr'g Tr.").[1]]  On February 5, 2020, Holland filed his post-hearing brief in support of the motion [Doc. 29], and on February 20, the government filed its response [Doc. 30].  Holland filed a reply on March 12.  [Doc. 34.]  The Motion is now ripe for review.

For the reasons that follow, the Court concludes that based on the totality of the circumstances, the U.S. Probation officers who searched Holland's residence had reasonable suspicion to believe that he had violated the terms of his supervised release, and therefore did not infringe upon his Fourth Amendment rights in conducting the search.  Since the search was not unlawful, neither was the seizure

---

[1] Government's exhibits 2 through 9, which were admitted at the evidentiary hearing, are available at docket entry 24.  Exhibit 1, which—as explained in more detail below—depicts sexually evocative images of minor boys and contains information that could be used to identify the boys, is under seal.

of Holland's cell phones.  Accordingly, it is **RECOMMENDED** that Holland's

Motion be **DENIED**.[2]

## I.     BACKGROUND

In January 2004, Holland was sentenced to 151 months imprisonment and

three years' supervised release after pleading guilty to ten counts of receiving child

pornography.  (Gov't Ex. 5 [Doc. 24-6] at 1-2.)  The conditions of his supervised

release required, among other things, that he "permit a probation officer to visit

him . . . at any time at home or elsewhere and shall permit confiscation of any

contraband observed in plain view by the probation officer."  (*Id.* at 4; *see also id.*

at 3 ("The defendant shall submit to a search of his person, property, real or

personal, residence, place of business or employment, and/or vehicle(s) at the

request of the United States Probation Officer.")).  Holland was also required to

participate in a treatment program for sex offenders and abide by the conditions of

a compliance contract as directed by his U.S. Probation Officer.  (*Id.* at 3.)

---

[2] Holland initially filed his motion to suppress and attached the images of the minors mentioned above.  [Doc. 13.]  The Court ordered that the motion be sealed due to the nature of the images and out of concern of the privacy interests of the minors, and ordered Holland to file an amended motion to suppress that omitted the images.  [Doc. 14.]  The initial motion—which is substantively identical to the amended motion—should also be **DENIED**.

On July 11, 2014, Holland was released from custody. (Hr'g Tr. at 48-49.) He resided at Dismas House Charities ("Dismas"), a halfway house in Atlanta, Georgia, until February 2015, when he was expelled for possessing an unauthorized cellular device in violation of Dismas's rules. (*Id.* at 49.) U.S. Probation did not take any action to revoke his supervised release at that time. (*Id.*)

On January 21, 2017, Holland's probation officer made an unannounced visit to his residence and discovered several unauthorized cell phones in violation of his compliance contract. (Hr'g Tr. at 50.) The officer seized the devices and asked Holland if they contained pornography; Holland told the officer that there would be some pornography of persons aged 16 years and older. (*Id.*) Ten days later, during a session with his sex offender treatment provider, Highland Institute, Holland mentioned that he had seen a message on Snapchat, thus indicating that Holland was accessing the internet, also in violation of his compliance contract. (*Id.*; *see also id.* at 69 (identifying Highland Institute as Holland's treatment provider).)[3]

---

[3] The following month, Holland was also removed from his treatment group for making excuses and attempting to manipulate the group. (Hr'g Tr. at 50-51.)

In May 2017, Holland's supervising officer moved to revoke his supervised release, alleging that Holland had failed to follow the instructions of the compliance contract by (1) possessing the seven cell phones (capable of accessing the internet, and having done so without first obtaining written permission from his supervising officer); and (2) possessing two phones that contained sexually oriented material or pornography.  (Hr'g Tr. at 51; Gov't Ex. 6 [Doc. 24-7] (Violation Report and Petition for Summons).)  Holland admitted the allegations in the petition; and in July 2017, the Court revoked his supervised release and sentenced him to one day imprisonment and twenty-four months of supervised release, with six months to be served at Dismas.  (Hr'g Tr. at 51; Gov't Ex. 7 [Doc. 24-8] (Amended Order/Judgment).)

On August 3, 2017, Holland entered into a new compliance contract pursuant to the original and amended conditions of his supervised release.  (Gov't Ex. 8 [Doc. 24-9] (Sex Offender Compliance Contract); *see also* Gov't Ex. 5 at 3; Gov't Ex. 7 at 2 (imposing "all other general and special conditions of supervised release apply from the original Judgment and Commitment").)  The Sex Offender Compliance Contract (the "Compliance Contract") required Holland not to "possess, purchase or subscribe to any sexually oriented material or pornography

5

to include mail, computer, telephone (900 telephone numbers), video or television, nor patronize any place where such material or entertainment is available." (Gov't Ex. 8 at 1.)  He was also required to "obtain written approval from my U.S. Probation Officer to use an electronic bulletin board system, services that provide access to the Internet, or any public or private computer network" and to "permit routine inspection of any computer systems, hard drives, and other media storage materials to confirm compliance with this condition," with such inspection "to be no more intrusive than is necessary to ensure compliance with this condition." (*Id.* at 2.)  He additionally agreed that "[a]ny computer system which is accessible to me is subject to inspection" and that he would "permit confiscation and/or disposal of any material considered contraband." (*Id.*)  In short, during his supervised release, Holland was not allowed to (1) possess any sexually oriented material, (2) use the internet without permission, or (3) possess any cell phone capable of accessing the internet. (*Id.* at 2-3; *see also* Hr'g Tr. at 53.)

On October 12, 2017, Holland, having been released from prison, returned to Dismas, where he resided until April 12, 2018. (Hr'g Tr. at 52, 54, 67-68.) During his stay there, he was prohibited by Dismas rules from possessing a cell phone without approval or possessing any other device that could access the

6

internet. (*Id.* at 68.) Though Holland requested approval to possess internet-capable devices, it was never granted. (*Id.* at 53.)

On March 12, 2018, Officer Brewer began supervising Holland. (Tr. 43.) Upon receiving the assignment, she reviewed Holland's presentence investigation report ("PSR"), the judgment and commitment materials, documents regarding his case, any notes from previous supervising officers, and his Compliance Contract. (Hr'g Tr. at 44-45.) From the PSR, Officer Brewer learned that Holland had previously been tried on sex offenses involving minors, including a 1996 case that resulted in a mistrial and a 1999 case involving a minor boy, which was dismissed after the victim recanted. (*Id.* at 46-47.) She also learned that after the 1999 case was dismissed, federal agents recovered Holland's diary, which revealed that Holland had written extensively about his relationship with the victim and that the victim, at Holland's urging, had lied on the stand. (*Id.* at 47.) Officer Brewer also learned details concerning the charges underlying Holland's 2004 federal conviction. (*Id.* at 48.)

On March 31, 2018, the National Center for Missing and Exploited Children ("NCMEC") received a cybertip[4] that in December 2017 and January 2018, four images of prepubescent boys were uploaded to Instagram by account user "yungcool1s." (Hr'g Tr. at 12-13, 28; Gov't Ex. 1.) Instagram reported that the display name for the account was "Yung In Atl" and that the associated email address was branbarn90@gmail.com. (Hr'g Tr. at 13, 28.) NCMEC forwarded the information to the GBI, and in April 2018, SA Bigham was assigned to the cybertip. (*Id.* at 10, 27.)

SA Bigham investigated the cybertip and determined that the images had been uploaded from a T-Mobile IP address, indicating that the images had likely been uploaded to Instagram using a mobile device. (*Id.* at 14-15, 34.) A subpoena was issued to Google in September 2018, and SA Bigham obtained subscriber information from Google in November 2018, which in turn indicated that the phone

---

[4] By law, internet service providers are required to report suspected child pornography, child sex trafficking, or online exploitation of a child to NCMEC in the form of a "cybertip." (Hr'g Tr. at 9.) *See also* 18 U.S.C. § 2258A (reporting requirements for providers to reduce and prevent "online child sexual exploitation"; providing further that NCMEC may forward reports to state and federal law enforcement). NCMEC then determines the jurisdiction to which the cybertip should be referred for further investigation. (Hr'g Tr. at 10.) Cybertips pertaining to Georgia are forwarded to and handled by a GBI task force. (*Id.*)

number 404-914-4767 was associated with the "branbarn90@gmail.com" email account. (*Id.* at 15-18; Gov't Ex. 2 [Doc. 24-3] (Google subpoena and response).) SA Bigham was then able to match the phone number with the one Holland listed on his current Georgia driver's license. (Hr'g Tr. at 16-18.) During her investigation, SA Bigham also learned that Holland had a criminal history that included child exploitation crimes and that he was a registered sex offender. (*Id.* at 18.) Finally, SA Bigham queried NCMEC for any other cybertips including "yungcool1s," and in December 2018, obtained a separate NCMEC cybertip from Tumblr with what appeared to be hundreds of links to suspected child pornography; however, she was unable to view the images because the links were no longer functioning. (*Id.* at 18-20; Gov't Ex. 3 [Doc. 24-4] at 9.)

On January 3, 2019, SA Bigham called Officer Brewer and reported that the GBI had received a cybertip that Holland was uploading erotic images of ten- to twelve-year-old boys to Instagram. (Hr'g Tr. at 21, 25, 60.) SA Bigham told Officer Brewer that the boys were not entirely nude, but that an outline of their penises could be seen in the photographs. (*Id.*) SA Bigham also reported that Holland's phone number had been used to establish the Instagram account. (*Id.*) Neither Officer Brewer nor SA Bigham recalls whether SA Bigham told Officer

Brewer the dates that the four images had been uploaded to Instagram.  (*Id.* at 21, 61, 65.)

On January 8, 2019, Officer Brewer learned from Holland's sex offender treatment provider that earlier that month, Holland encountered one of his prior victims (who was then 30 years old) at a Goodwill store.  (Tr. 57.)  Though the encounter appeared to have been happenstance, Holland did not report it to Officer Brewer.  (*Id.* at 57-58.)

Based on the information that SA Bigham relayed, as well as Officer Brewer's knowledge that Holland was not allowed to have an internet connection and that his prior supervised release had been revoked for possessing contraband cell phones and pornography, Officer Brewer was concerned that Holland had violated the Compliance Contract.[5]  (Hr'g Tr. at 60-61.)  On January 14, 2019, U.S. Probation, including Officer Brewer, searched Holland's residence and seized four

---

[5] Officer Brewer testified that before the search, she did not know when the four images had been uploaded to Instagram.  (Hr'g Tr. at 65.)  But, according to Officer Brewer, even if SA Bigham had told her that the images had been uploaded approximately a year before the search, Officer Brewer would still have had the same concerns because "all the risks were still present"—namely, that Holland had unauthorized access to the internet and possession of sexually oriented material. (*Id.* at 61-62, 65.)

10

cell phones that contained evidence that led to the charges in this case.  (*Id.* at 24, 80-81.)

Additional necessary facts are discussed in context below.

## II.     DISCUSSION

### A.     The Parties' Arguments

Holland argues that "there was no reasonable suspicion at the time GBI agents and U.S. Probation Officer entered his residence because (1) the evidence is lacking that [he] 'used' Instagram[] and (2) the flagged social media pictures were in fact photos not rising to the level of child pornography or sexually oriented material."  [Doc. 29 at 11-12 (footnotes omitted).[6]]  He contends that "there is no evidence" that he actually uploaded the images of the boys, and that at the time that the images were uploaded, he was residing at Dismas and was not allowed to use the internet.  [*Id.* at 12; *see also id.* at 9 ("Mr. Holland was a resident of the Dismas House, where access to the Internet was largely prohibited.").]  According to Holland, the "sole justification of a potential violation of [his] supervised release

---

[6] It bears mentioning that contrary to Holland's argument, only U.S. Probation Officers entered the residence, not GBI agents.  (*See* Hr'g Tr. at 80-81.) While GBI agents were on site, they waited outside the residence.  (*Id.* at 80.)

was his possession of th[o]se photos," and since the evidence that he posted the images was "questionable," no reasonable suspicion exists. [*Id.* at 12-13.]

In response, the government argues that, taking stock of the information known to Officer Brewer as of January 14, 2019, there was reasonable suspicion that Holland possessed electronic devices capable of accessing the internet and child pornography (and had used the internet) in violation of his conditions of his conditions of release and the Compliance Contract, justifying the search of his residence. [Doc. 30 at 12-15.] The government additionally argues that there was ample evidence that Holland had in fact used Instagram to upload the images that were the subject of the NCMEC cybertip and that the images themselves were sufficiently graphic to raise concern that Holland—who had been convicted for receipt of child pornography and whose prior supervised release had been revoked for possessing contraband phones with sexual explicit material—possessed more sexually explicit photographs. [*Id.* at 15-18.]

On reply, in an attempt to undercut the government's argument that reasonable suspicion existed for the search, Holland points out that before January 2018, he was not "directly accused of accessing the internet without permission while on supervised release"; no unauthorized cell phones were seized from him

12

after January 2017; he resided at Dismas from October 2017 to April 2018 without being accused of any violations of Dismas rules or conditions of supervised release; he passed polygraph examinations in March and August 2018; probation officers who visited his home and place of employment in 2017 and 2018 did not find any violations of supervised release conditions; and he received mental health treatment in 2017 and 2018. [Doc. 34 at 1-2.] He additionally argues that as of January 14, 2019, the investigation into the cybertip had not "reveal[ed]" to Officer Brewer that Holland was in fact "connect[ed]" to the images, instead showing only that someone had used Holland's telephone number in establishing the Instagram account. [*Id.* at 3-4.] He contends that SA Bigham's investigation did not reveal who established the Instagram account, who accessed it, who uploaded the images, how they were uploaded, where the device (or devices) were located at the times the images were uploaded, or that the email address was associated with Holland. [*Id.* at 3.] According to Holland, the only new information the government had to justify the search in January 2019 was "that a telephone number inputted by the Instagram account user was associated with Mr. Holland," which is insufficient for reasonable suspicion. [*Id.* at 4.]

13

### B.    Analysis

Probationers are entitled to protection from unreasonable searches and seizures under the Fourth Amendment; however, their expectation of privacy is diminished. *See Owens v. Kelley*, 681 F.2d 1362, 1367-68 (11th Cir. 1982). "Such limitations are permitted because probationers have been convicted of crimes and have thereby given the state a compelling interest in limiting their liberty in order to effectuate their rehabilitation and to protect society." *Id.* at 1367. The Eleventh Circuit has held that a warrantless search of a probationer's residence by probation officers is constitutionally permissible where it is based on a "reasonable suspicion" that the probationer is in violation of his probation conditions or engaged in criminal conduct. *See United States v. Carter*, 566 F.3d 970, 975 (11th Cir. 2009); *see also United States v. Rile*y, 706 F. App'x 956, 960 (11th Cir. 2017) ("[P]robation officers are required to have reasonable suspicion of criminal conduct in order to search a probationer's residence when the terms of probation do not require him to submit to warrantless searches."), *cert. denied*, 138 S. Ct. 699 (2018); *United States v. Wasser*, 586 F. App'x 501, 505 (11th Cir. 2014) (concluding that, after probation officers lawfully entered a probationer's residence, they developed reasonable suspicion that probationer had violated the terms of his probation, justifying a search of the residence for additional

14

violations); *United States v. Gomes*, 279 F. App'x 861, 869 (11th Cir. 2008) ("A probationer's house may be searched based upon reasonable suspicion."); *United States v. Denton*, No. 1:11-CR-00546-AT-RGV, 2012 WL 3871929, at *7-8 (N.D. Ga. June 19, 2012) (all that was required to search a probationer's computer was reasonable suspicion, even where the probation agreement did not require him to submit to warrantless searches), *report and recommendation adopted*, 2012 WL 3871927 (N.D. Ga. Sept. 5, 2012). Reasonable suspicion consists of a sufficiently high probability that criminal conduct (or conduct in violation of probation conditions) is occurring to make the intrusion on the individual's privacy interest reasonable. *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005). To determine whether the officer has a particularized and objective basis for suspected wrongdoing, the court must examine the totality of the circumstances and "take stock of everything [officers] knew before searching." *Id.*

The totality of the circumstances here amply demonstrates that the search of Holland's residence was supported by reasonable suspicion that he was in violation of his conditions of release. At the time of the search, Officer Brewer was aware that Holland had a lengthy criminal history involving sexual offenses against minors, including receipt of child pornography, and a sexual proclivity for minor

boys; that in 2015, he was expelled from Dismas for possession of an unapproved cell phone; that in January 2017, he possessed seven unapproved devices capable of accessing the internet, some of which contained pornography involving individuals as young as 16 years old; that in December 2017 and January 2018, four erotic images of minor boys were uploaded to an Instagram account that was traced to a phone number associated with his current driver's license; that the Instagram account display name, "Yung in Atl," demonstrated a connection to Atlanta, where Holland lived, and was suggestive of Holland's history of involvement with minors. "Taken together, the facts and the rational inferences that follow indicate the high probability that [Holland] was violating the conditions of his supervised release at the time of the search," including his possession of unauthorized internet-capable devices and sexually oriented material/pornography. *United States v. Collins*, 683 F. App'x 776, 779 (11th Cir. 2017).

Holland's arguments to the contrary are without merit. His contention that there is no evidence that he uploaded the four images overlooks the record. As discussed above, SA Bigham's investigation of the cybertip revealed evidence linking Holland to the Instagram account "yungcool1s" where the images were uploaded. To recap, SA Bigham determined that the Instagram account was

16

associated with a Gmail account, which, in turn, was associated with the telephone number for Holland's current driver's license.  In addition, the display name for the Instagram account could reasonably be understood to refer to Atlanta, where Holland lived, as well as his apparent history of having a sexual preference for minors.[7]

Similarly, the Court is not persuaded by Holland's assertion that he could not be the individual who uploaded the images because he resided at Dismas at the time they were uploaded.  Although the Dismas rules prohibited him from

---

[7] In making his argument, Holland implies that anyone could have input his telephone number into Instagram, and concludes that any connection between his telephone number and the images is therefore meaningless.  This conclusion, however, ignores the unlikelihood that someone using Instagram to upload sexual imagery of prepubescent boys would randomly pick the telephone number associated with a person recently convicted of receiving child pornography.

Though not used in the Court's analysis (as testimony was not offered on the point), the Court also notes that contrary to Holland's position, the Instagram account was not associated directly with his telephone number, but rather, with a Gmail account.  The Gmail account, in turn, was associated with Holland's number.  Along these lines, the Court is aware that Gmail requires email users to provide a telephone number to set up and maintain an account, and only allows a new account to be opened once the user verifies the telephone number by providing a code texted to the number.  While Holland suggests that anyone could have "associated" his number with the account connected to the illicit images, such an inference becomes reasonable only if one presumes that the alleged third party has the capacity to spoof Holland's number and, again, by mere chance chose Holland's telephone number to spoof.

accessing the internet, and although there were no reports of Holland violating Dismas's rules during his present stay, it is still reasonable to infer based on the totality of the circumstances that he used an internet-capable mobile device in violation of the Dismas rules and simply was not caught. After all, not only are mobile devices portable and relatively easy to conceal, Holland has a demonstrated penchant for possessing unauthorized mobile devices while on supervised release.[8]

---

[8] In support his argument that there is no evidence that he used Instagram, Holland comes dangerously close to misrepresenting a statement that the Court made from the bench at the evidentiary hearing. Specifically, in support of his assertion that "the evidence is lacking that [he] 'used' Instagram," Holland cites to the Court's statement that: "So regardless of whether he had permission to use the internet or not, there's nothing that would suggest that he had the ability to use Instagram." [Doc. 29 at 12 n.2 (citing Hr'g Tr. at 84).]

Viewing the Court's statement in context, it is clear the Court was not commenting on the sufficiency of the evidence that Holland has used Instagram to upload the pictures. Rather, the Court made the statement in response to defense counsel's request to keep the evidentiary hearing open so he could subpoena records from Holland's sex offender treatment provider because counsel believed that the treatment provider may have records showing that it gave Holland approval to access the internet. The Court's point was that regardless of whether the treatment provider had approved his use of the internet (a dubious claim, because U.S. Probation must give the approval), there was still no evidence that Holland had ever been allowed to use Instagram. At the end of the day, whether or not Highland purported to give Holland permission to use the internet is beside the point because Holland was prohibited by the terms of his Compliance Contract from possessing or using any services that provided access to the internet without express written permission from U.S. Probation, and there is no evidence that he ever obtained that permission. (*See* Gov't Ex. 8 at 2.)

18

Holland's next assertion that the images of the minor boys are not sexually oriented material is also a complete nonstarter. Those photographs—which the government has accurately (and graphically) described in its brief—are unquestionably erotic. [*See* Doc. 30 at 17-18.] What's more, the text accompanying one of the photographs–"yungonesagain" and "them cute boys"— is sexually suggestive when viewed in context of the accompanying images. (*See* Hr'g Tr. at 13.) Again, given the totality of the circumstances, the fact that the genitalia of the boys depicted in the photographs was not fully exposed does not negate reasonable suspicion that Holland had violated the terms of his supervised release.[9]

Finally, in Holland's reply, he identifies numerous facts that, in his view, undermine the existence of reasonable suspicion. Among these are facts indicating that in 2017 and 2018, he was not accused of violating the terms of his supervised release or the Dismas rules; but, of course, the fact that he was not accused of

---

[9] Holland cites *United States v. Gomes*, 279 F. App'x 861 (11th Cir. 2008) and *United States v. Yuknavich*, 419 F.3d 1202 (11th Cir. 2005), as examples of cases in which the Court of Appeals has found reasonable suspicion of a probation violation existed to justify a warrantless search. [*See* Doc. 29 at 13-15.] Even if *Gomes* and *Yuknavich* presented more compelling facts to support a finding of reasonable suspicion, those cases do not represent the outer limits of what constitutes reasonable suspicion.

19

violations does not mean that he had no involvement in the posting of the images to Instagram, merely that he was not discovered doing so at the time. He also points out that in 2018 he passed polygraph examinations (*see* Hr'g Tr. 70); however, the fact that he passed those examinations does not negate reasonable suspicion given the totality of the circumstances. His contention that Officer Brewer was not aware of the details of SA Bigham's investigation is of no moment either, since the results of that investigation, linking Holland to the account on which uploaded images appeared, was shared with Officer Brewer.

Ultimately, taken together, the totality of the facts (and the obvious inferences that follow) provided U.S. Probation officers with reasonable suspicion that Holland was violating the conditions of his supervised release at the time of his residence was search, and his argument that the search was unlawful is without merit.[10]

---

[10] To the extent that Holland challenges the search of the contraband cellphones themselves, that argument was not raised in his motion to suppress or at the evidentiary hearing. Again, Holland's theory is that the evidence seized from the phones should be suppressed because the phones were seized as a result of an unlawful search.

III.   **CONCLUSION**

For the foregoing reasons, it is **RECOMMENDED** that Holland's motion to suppress [Doc. 13] and amended motion to suppress [Doc. 16] be **DENIED**.

I have now addressed all referred pretrial matters relating to this defendant and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 26th day of March, 2020.

_____
JOHN K. LARKINS III
United States Magistrate Judge